3:18-MC-519

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-cv-61017 Altonaga

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

POINTBREAK MEDIA, LLC, a limited liability company,
also d/b/a Point Break Media, Point Break Solutions, and
Kivanni Marketing,

DCP MARKETING, LLC, a limited liability company, also
d/b/a Point Break,

MODERN SPOTLIGHT LLC, a limited liability company,

MODERN SPOTLIGHT GROUP LLC, a limited liability
company, also d/b/a Modern Spotlight,

MODERN INTERNET MARKETING LLC, a limited
liability company,

MODERN SOURCE MEDIA, LLC, a limited liability
company, also d/b/a Modern Source,

PERFECT IMAGE ONLINE LLC, a limited liability
company,

DUSTIN PILLONATO, individually and as an officer of
Pointbreak Media, LLC, DCP Marketing, LLC, and Modern
Source Media, LLC,

JUSTIN RAMSEY, individually and as an officer of
Pointbreak Media, LLC,

AARON MICHAEL JONES, a/k/a Michael Aaron Jones
and Mike Jones, individually and as an officer of Pointbreak
Media, LLC,

RICARDO DIAZ, individually and as an officer of
Pointbreak Media, LLC,



FILED BY _____ D.C.

MAY - 7 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

**COMPLAINT FOR
PERMANENT INJUNCTION
AND OTHER EQUITABLE
RELIEF**

**Filed Under Seal**

FILED
SCRANTON
SEP 10 2018
PER _____
DEPUTY CLERK

MICHAEL POCKER, individually and as an officer of
Modern Spotlight LLC and Modern Spotlight Group LLC,

STEFFAN MOLINA, individually and as an officer of
Modern Spotlight Group LLC and Perfect Image Online
LLC,

        Defendants.

---

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint

alleges:

      1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission

Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive

relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement

of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## JURISDICTION AND VENUE

      2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

      3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2-3), (d) and 15 U.S.C.

§ 53(b).

## PLAINTIFF

      4.      The FTC is an independent agency of the United States Government created by

statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

which prohibits unfair or deceptive acts or practices in or affecting commerce.

      5.      The FTC is authorized to initiate federal district court proceedings, by its own

attorneys, to enjoin violations of the FTC Act, and to secure such equitable relief as may be

appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A).

## DEFENDANTS

6.      Defendant Pointbreak Media, LLC ("Point Break"), also doing business as Point Break Media, Point Break Solutions, and Kivanni Marketing, is a Delaware limited liability company with its principal place of business in Boca Raton or Deerfield Beach, Florida. Point Break transacts or has transacted business in this district and throughout the United States.

7.      Defendant DCP Marketing, LLC ("DCP Marketing"), also doing business as Point Break, is a Florida limited liability company with its principal place of business in Boca Raton, Deerfield Beach, or Lake Worth, Florida. DCP Marketing transacts or has transacted business in this district and throughout the United States.

8.      Defendant Modern Spotlight LLC ("Modern Spotlight") is a Florida limited liability company with its principal place of business in Boca Raton or Deerfield Beach, Florida. Modern Spotlight LLC transacts or has transacted business in this district and throughout the United States.

9.      Defendant Modern Spotlight Group LLC ("Modern Spotlight Group"), also doing business as Modern Spotlight, is a Florida limited liability company with its principal place of business in Boca Raton or Deerfield Beach, Florida. Modern Spotlight Group transacts or has transacted business in this district and throughout the United States.

10.      Defendant Modern Source Media, LLC ("Modern Source"), also doing business as Modern Source, is a Florida limited liability company with its principal place of business in Boca Raton or Deerfield Beach, Florida. Modern Source transacts or has transacted business in this district and throughout the United States.

11. Defendant Modern Internet Marketing LLC ("Modern Internet Marketing") is a Florida limited liability company with its principal place of business in Boca Raton or Deerfield Beach, Florida. Modern Internet Marketing transacts or has transacted business in this district and throughout the United States.

12. Defendant Perfect Image Online LLC ("Perfect Image Online") is a Florida limited liability company with its principal place of business in Boca Raton or Deerfield Beach, Florida. Perfect Image Online transacts or has transacted business in this district and throughout the United States.

13. Defendant Dustin Pillonato ("Pillonato") is an owner and manager of Point Break, DCP Marketing, and Modern Source. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Pillonato resides in West Palm Beach, Florida and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14. Defendant Justin Ramsey ("Ramsey") is an owner and manager of Point Break. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Ramsey resides in Boca Raton, Florida and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

15. Defendant Aaron Michael Jones ("Jones") is an owner and manager of Point Break. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and

practices set forth in this Complaint. Jones resides in Irvine, California and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

16.     Defendant Ricardo Diaz ("Diaz") is an owner and manager of Point Break. Diaz also served as treasurer of Point Break. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Diaz resides in Cranston, Rhode Island and, at times material to this complaint, resided in Miramar, Florida. In connection with the matters alleged herein, Diaz transacts or has transacted business in this district and throughout the United States.

17.·     Defendant Michael Pocker ("Pocker") is an owner and manager of Modern Spotlight and Modern Spotlight Group. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Pocker resides in Boca Raton, Florida and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

18.     Defendant Steffan Molina ("Molina") is an owner and manager of Modern Spotlight Group and Perfect Image Online. Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Molina resides in Boca Raton, Florida and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

19.     Defendants Pointbreak Media, LLC, DCP Marketing, LLC, Modern Spotlight

LLC, Modern Spotlight Group LLC, Modern Internet Marketing LLC, Modern Source Media,

LLC, and Perfect Image Online LLC (collectively, "Corporate Defendants") have operated as a

common enterprise while engaging in the acts and practices alleged below.  As described in more

detail in paragraphs 88-167, Corporate Defendants have conducted these acts and practices

through a maze of interrelated companies under common or overlapping control, with common

employees, in shared office space, and with commingled funds.

20.     Because these Corporate Defendants have operated as a common enterprise, each

is jointly and severally liable for the acts and practices alleged below.  Defendants Pillonato,

Ramsey, Jones, Diaz, Pocker, and Molina (collectively, the "Individual Defendants") have

formulated, directed, controlled, had the authority to control, or participated in the acts and

practices of the Corporate Defendants that constitute the common enterprise.  The Individual

Defendants each had knowledge of the unlawful acts and practices of the Corporate Defendants

that constitute the common enterprise.

## COMMERCE

21.     At all times material to this Complaint, the Defendants have maintained a

substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of

the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

22.     As described in more detail in paragraphs 28-74, Defendants operate a

telemarketing scam in which they target small business owners with false threats of removal

from Google's search engine and false promises of unique keywords in order to convince them to purchase a Google "claiming and verification" service. Defendants explain that keywords are search terms for which the consumer's business will appear prominently in search results. Defendants charge $300-$700 for the claiming and verification service.

23. Defendants also target each paying consumer with an upsell that falsely promises that the consumer's business will receive first-page placement in Google search results. Defendants charge a flat fee of $949.99 and an additional monthly recurring charge of $169.99 or $99.99 for these search engine optimization services.

24. In late October 2017, when Defendants lost the ability to process credit card transactions, they wrote themselves $100 checks from at least 250 consumers' bank accounts without those consumers' knowledge or authorization.

### Google My Business

25. Defendants' initial sales pitch relates to Google's "Google My Business" service. Google My Business allows business owners to manage their business listings, including updating their business information (such as hours of operation and address), adding photographs, and responding to reviews.

26. A business owner gains control of his or her Google My Business listing by either claiming a preexisting listing or creating a new listing and then verifying that he or she is authorized to manage the business. The owner usually verifies his or her authority to manage the business by providing a verification code that Google mails to the business address. Claiming the business takes no more than 15 minutes, and verifying it after receipt of the code takes no more than three minutes.

27.     Google does not charge business owners for claiming and verifying their business listings, and the process does not involve identifying or claiming "keywords." Claiming and verifying a business with Google does not guarantee first-page placement in search results.

### Defendants Target Consumers With Threatening Robocalls

28.     Since November 2016 at the latest, Defendants have placed threatening robocalls to small business owners and other consumers, in an effort to induce them to "press one" to speak to a live sales agent. Many consumers receive multiple robocalls daily from Defendants.

29.     On these robocalls, Defendants deliver recorded messages frequently claiming to be authorized by Google. The calls threaten that Google will label the consumer's business "permanently closed" unless the consumer takes action. The robocalls then invite the consumer to "press one" to speak with a "Google specialist."

30.     One robocall, frequently used while Defendants operated as Point Break, states in full:

> Hi, this is Jennifer Taylor, data service provider for Google and Bing. This is an urgent message for the business owner. We have tried numerous times to contact you through mail and now by telephone regarding your Google listing webpage. This is your final notice. If you do not act soon, Google will label your business as permanently closed. Press one now to speak with me or another Google specialist.
>
> Did you know that 74 percent of your customers search online before making a purchase? If your Google listing is shut down, you will lose on all of those potential customers. It is critical that you, the business owner, take advantage of this rare opportunity to get ahead of your competition. Press one now to find out how to validate your free Google listing.
>
> This message applies to all business owners. If you are the business owner, press one now. Press two if this is not a business or you would like to be removed from our calling list.

31.     Another robocall, frequently used while Defendants operated as Modern

Spotlight Group, states in full:

> Your Google Business listing may be inactive. Immediate action
> is required.
>
> Please press one to speak with a representative and avoid being
> removed from Google.
>
> Please press eight to be removed from this list.

32.     A third robocall, also used while Defendants operated as Point Break, states in

full:

> Hi, this is Jonathan Smith, third party service provider for Google
> and Bing. This is an urgent message for the business owner. We
> have tried numerous times to contact you by telephone regarding
> your Google listing webpage. Press one now to speak with me or
> another listing specialist.
>
> Did you know that up to 74 percent of your customers could search
> online before making a purchase? It is critical that you, the
> business owner, take advantage of this rare opportunity to get
> ahead of your competition. Press one now to find out how to
> validate your listing.
>
> This message applies to all business owners. If you are the
> business owner, press one now, or press two if this is not a
> business or you would like your number to be removed from the
> calling list. Thank you.

33.     These robocalls and others used by Defendants contain numerous false or

misleading statements.

34.     The Defendants are not "service providers" for Google and have no affiliation

with or authorization from the company.

35.     Additionally, the small businesses called by Defendants face no real risk of being

removed from Google search results. Google does not label a business as permanently closed or

"remove" it from search results simply because the business's owner has not claimed and verified the business.

36.     Moreover, Defendants place their robocalls to many business owners who have, in fact, already claimed and verified their businesses through Google My Business.

37.     Although Defendants' robocalls present a "press two" or "press eight" option to be removed from the Defendants' calling list, Defendants do not remove consumers who press two or eight from their call lists. Defendants continue to call these consumers several times daily or weekly.

### Defendants' Sales Agents Use False Statements to Sell Google Listing Services

38.     Defendants transfer consumers who press one in response to the robocalls to a live sales agent. The agent uses a script to lead these consumers through a sales pitch in which he or she claims that (1) Defendants are authorized by, or affiliated with, Google; (2) the consumer needs to pay Defendants to claim and verify the consumer's business in order to avoid having the business removed from, or marked permanently closed by, Google; and (3) paying Defendants will allow the consumer to link certain "keywords" to the consumer's Google listing, resulting in prominent search result placement in response to searches for those keywords.

39.     These claims are all false or misleading.

40.     Defendants Ramsey and Pillonato drafted the script used by Point Break's sales agents. Modern Spotlight Group and Perfect Image Online continue to use a similar script that features the same three misrepresentations.

### Defendants' Claims of Google Authorization or Affiliation

41.     On many calls, Defendants' sales agents expressly tell consumers that they work for Google.

42. On other calls, Defendants' sales agents admit to working for one of the Corporate Defendants rather than Google, but call their employer an "authorized Google My Business agency" or a contractor for Google.

43. For example, on one call recorded by a consumer, one of Defendants' sales agents twice identified Defendant Modern Spotlight Group as "an authorized Google My Business agency," later adding that Google had authorized Modern Spotlight Group to "claim and verify Google business listings."

44. A different sales agent made the same representation on a call with an undercover FTC investigator, identifying Modern Spotlight Group as an "authorized Google – Google My Business agency." The agent claimed that Google had "contract[ed] out" with Modern Spotlight Group. Later on the same call, a different sales agent identified himself as a "senior authorized Google My Business representative" and again identified Modern Spotlight Group as an "authorized Google My Business agency."

45. On another call recorded by a consumer, one of Defendants' sales agents explained that Point Break is "like the umbrella under Google." On yet another call recorded by a different consumer, a sales agent from Point Break claimed, "We work directly parallel with Google. . . . Google Corporate . . . , they would reach out to like Walmart, Costco, Target, Starbucks, because they have multiple locations in just one distinctive area. That's why they have companies like us to reach out to small to medium size companies."

46. Even when Defendants' sales agents do not affirmatively claim that one of the Corporate Defendants is an "authorized Google My Business agency," they fail to correct the misrepresentation made on many of the immediately preceding robocalls that the caller is a "service provider for Google." Instead, for example, the script drafted by Ramsey and Pillonato

builds on the robocall's misrepresentation by directing the sales agents to start the call by declaring themselves "here to assist you with your Google listing" and stating that "our system" "shows your Google Listing (for name of company) has not been claimed or verified." The script directs Defendants' sales agents only to identify their employer if directly asked.

47. Defendants' claims described in paragraphs 41-46 are false.

48. Google has not authorized any of the Defendants to act on its behalf, and Google is in no way affiliated with any of the Defendants. Google has not contracted with Defendants to claim and verify Google listings. Google also does not approve, sponsor, or endorse the Defendants' services.

### Defendants' Threats of Removal from Google

49. Defendants' sales agents usually start their sales calls by claiming that the consumer's Google business listing "has not been claimed or verified."

50. The sales agents proceed to state that because the consumer has not claimed and verified his or her business, the business "run[s] the risk of possibly being removed from the search engine or pushed so far down the search engine that no one will find you."

51. Defendants' sales agents then offer to help consumers avoid removal from Google by claiming and verifying the consumer's Google business listing on the consumer's behalf.

52. When consumers attempt to decline Defendants' services, the sales agents frequently return to threats of removal from Google. For example, when an undercover FTC investigator asked what would happen if she did not pay Defendant Point Break's fee, the agent replied, "Well, ma'am, then you are going to be running the risk of possibly being removed from Google. Google did give you a designated time slot to verify your business with them and you

did not meet that." When the investigator nevertheless declined, the agent replied, "Have fun being removed from the Internet" and hung up.

53.     On another undercover call with Defendant Modern Spotlight Group, an FTC undercover investigator confirmed, "[I]f I don't claim and verify, do I get removed from Google? Is that how this works?" The agent replied, "Yes." The agent then proceeded to claim that, "You actually have the basic listing . . . . It's a basic listing that Google gave to every business five years ago. It's a simple name, address, and phone number listing. But right now, as the owner, it is your job to have the listing claimed and verified, marked as a trusted, open-for-business company because you guys are at risk of being removed because you're showing up improperly."

54.     Similarly, the script drafted by Ramsey and Pillonato for Point Break states, "Four years ago Google gave every business in the United States a Google Plus Page in hopes that businesses would claim and verify themselves."

55.     Defendants' claims described in paragraphs 49-54 are false.

56.     Google does not "remove" a business from the search engine simply because the business owner has not claimed and verified it.

57.     In fact, unclaimed business listings often appear in Google search results.

58.     Defendants also claim that consumers' businesses are not claimed and verified even when that statement is untrue.

59.     Google did not give "every business" a "basic listing" or a "Google Plus Page" five years ago.

*Defendants' Promises of Unique Keywords Linked to the Consumer's Business*

60.     After making their threats of removal from Google, Defendants' sales agents pivot to offering the consumer certain "keywords" as part of the claiming and verification process.

61.     The Point Break script directs agents to explain that "[p]art of the claiming and verification process is registering your keywords, so you come up prominently when someone is searching for your goods and services."

62.     Defendants' sales agents tell consumers that their businesses will appear on the first page of search results when potential customers search on Google for the keywords.

63.     On some calls, Defendants' sales agents promise consumers that these keywords will be unique to the consumers' business, such that no other business can use them.

64.     For example, on one call recorded by a consumer, Point Break's sales agent stated that the business owner would get "a list of keywords that nobody else can use in the world because they are your keywords." When the consumer sought to confirm that "nobody else can use the [keywords]," the agent responded, "Yes, sir, no one else can use them."

65.     Similarly, an undercover FTC investigator asked, "[W]ith the service I guess the keywords are—are specifically for my business and no one else can use the keywords[?]" Point Break's sales agent confirmed that this was correct.

66.     Defendants' claims described in paragraphs 60-65 are false.

67.     Defendants do not register or claim any keywords for consumers with Google, much less "unique" keywords.

68.     In fact, Google does not provide the option to "register," or claim, "keywords" as part of the Google My Business claiming and verification process.

69.     Consumers who have signed up for Defendants' services see no change in their search results, even when searching for the keywords that Defendants claim to have registered for them.

70.     After this sales pitch, Defendants' sales agents tell consumers that there is a purported one-time fee for the claiming and verification "services" offered by Defendants. That fee generally ranges from $300-700. If consumers ask earlier in the call whether there will be a cost, the sales agent sometimes tells the consumer that he or she is not yet sure. Other times, the sales agent does not provide a specific cost, and instead claims that a computer will generate a fee that depends on the consumer's industry and location.

71.     Consumers who sign up for Defendants' services provide either their credit card or checking account information to Defendants.

72.     When a consumer provides checking account information, Defendants generate a remotely created check that draws on the consumer's account.

73.     A remotely created check is processed through the banking system much like a traditional check, but without a consumer's signature, instead bearing a statement such as "Authorized by Account Holder." The check is created by the payee—here, one of the Corporate Defendants—rather than the individual or business on whose account the check is drawn.

74.     · After paying Corporate Defendants, some consumers receive a contract that Defendants' sales agents ask them to sign electronically. In the contract, Corporate Defendants promise to "build out the Google Maps link, a Google Plus page and a Google my Business listing" and to "use specific keywords and/or phrases set forth to impose the above business [sic] online visibility on Google." The contract does not set forth any keywords or phrases.

## Defendants Upsell Consumers on a "Citation Program"

75.     Shortly after making the initial payment, consumers receive an email or phone call from a "senior business analyst" working for one of the Corporate Defendants, typically either Point Break or Modern Source.  The analyst claims he or she was assigned to the consumer's new Google listing and is calling to finalize the business listing.

76.     On the follow-up call, rather than finalizing the business listing, the "senior business analyst" promotes a "Citation Program" that he or she claims will result in the consumer's business being listed on fifty additional search engines.

77.     Defendants tell consumers that this program will ensure prominent placement on Google.  They usually tell consumers that their business will become the first search result or one of the first search results.  Defendants sometimes tell consumers that the service has never failed a single customer.  On one call, a Modern Source sales agent told an undercover FTC investigator, "I don't care if you're pizza or if you're a plumber, I have seen this [program] work every single time."  He elaborated, "[W]e have a little over 4,500 clients in this secondary program, and it has worked for every one of them."

78.     The senior business analyst does not correct any of the misrepresentations made on the Defendants' previous conversations with the consumer.  The analyst, for example, does not correct the prior misrepresentation that the Defendants are authorized by, or affiliated with, Google.

79.     The Citation Program costs a one-time fee of up to $949.99 and recurring monthly payments typically equal to $169.99 or $99.99.  Defendants tell consumers that the monthly payments are necessary because completing the work will take several months.  There is no end date for the recurring charges.

80.     Consumers pay for the Citation Program by providing their credit card or checking account information to Defendants.  Then, Defendants either charge the credit card or generate a remotely created check that they deposit into one of their bank accounts.

81.     Defendants send consumers who agree to this upsell a "Citation Services and Reporting Agreement" to sign electronically.  The contract states that one of the Corporate Defendants "is authorized to use the specific keywords and/or phases [sic] set forth below for development and improving the ranking in Citations and/or directories that are most frequently used by the general public which are defined below."  The contract, however, never sets forth any keywords or directories.

82.     The contract also promises that the consumer's "search results will be strong and constantly improve."

83.     Defendants' claims are false or misleading.  No third party, including Defendants, can guarantee that a business will appear on the first page of Google search results.

84.     Consumers who sign up for the Citation Program see little or no improvement in their search results.

### Defendants' Unauthorized Consumer Billing

85.     In late October 2017, Bank of America Merchant Services closed Point Break's merchant account because of Point Break's "predatory services, scare tactics and processing history with high chargeback ratios."  As a result, Point Break lost the ability to accept payments by credit card.

86.     In response, Defendants simply took money, usually $100, from at least 250 of their prior or existing customers' checking accounts without those customers' advance

knowledge, consent, or authorization, and without any apparent reason or justification. Prior to this time, Defendants had not sold any services for which they regularly charged $100.

87.     Defendants took this money by generating remotely created checks written out to Point Break Media, often with "Google/Apple/Bing" in the memo line. Defendant Ramsey endorsed each check before depositing it into one of two different Point Break checking accounts at two different banks.

## DEFENDANTS' COMMON ENTERPRISE AND SHIFTING CORPORATE IDENTITIES

88.     Since November 2016, Defendants have operated their common enterprise through a series of business aliases and limited liability companies. These entities have all performed functions related to the unfair and deceptive practices outlined above. They have shared owners, managers, office space, and employees, and have commingled funds.

### Pointbreak Media, LLC

89.     Pointbreak Media, LLC formed in Delaware in May 2016.

90.     Point Break filed in July 2017 for authorization to transact business in Florida. The filing identified Point Break's principal office and mailing address as 951 Broken Sound Parkway, Suite 188, Boca Raton, FL 33487.

91.     Point Break's July 2017 filing identified Defendants Pillonato, Ramsey, Jones, and Diaz as "Managing Members" of Point Break. The filing also identified Diaz as Point Break's Treasurer and registered agent.

92.     Ramsey swore to the accuracy of the July 2017 filing, and Diaz also signed the filing as Point Break's registered agent.

93.     From November 2016 until December 2017, Point Break engaged in the unlawful acts and practices described in paragraphs 22-87 above. Specifically, Point Break used deceptive

claims to sell Google "claiming and verification" services to consumers, upsold those victims on the Citation Program service by using additional deceptive claims, and then, in October 2017, took $100 from over 250 consumers without authorization.

94. From November 2016 until March 2017, Point Break did business as "Kivanni Marketing."

95. Since March 2017, Point Break has done business as Point Break Media and Point Break Solutions.

96. Ramsey opened at least three merchant bank accounts for Point Break, through which Point Break processed credit card transactions. Two of the merchant accounts operated under the "Kivanni Marketing" name, while a third operated as "Pointbreak Media, LLC."

97. Defendants have held money obtained from consumers in at least two checking accounts and one savings account. Ramsey and Pillonato are signatories on both checking accounts. Ramsey is a signatory on the savings account.

98. In March 2017, Pillonato, acting on behalf of Point Break, signed a "cloud contact center" Master Services Agreement with a telecommunications company from which Pillonato obtained toll-free numbers that both Point Break and Modern Source provided to consumers.

99. Defendant Point Break sent or received money, either directly or indirectly, to and from Defendants Ramsey, Pillonato, Jones, Diaz, DCP Marketing, Modern Spotlight, Modern Spotlight Group, and Modern Internet Marketing.

100. For most of 2017, Point Break paid the rent at the Defendants' 951 Broken Sound Parkway, Suite 188, Boca Raton, FL 33487 address. Diaz signed a lease for use of that office space on behalf of non-party ConsultMe, LLC.

101. Throughout Point Break's existence, but especially in late 2017, it faced mounting obstacles, primarily in the form of increased public awareness of its scam and increased scrutiny from banks and credit card processors.

102. In July 2017, for example, a private plaintiff sued Point Break, Ramsey, and Pillonato for violations of the Telephone Consumer Protection Act. Within a few weeks, the plaintiff voluntarily dismissed the case after reaching a settlement agreement with Defendants.

103. Two months later, in September 2017, a different plaintiff filed a new Telephone Consumer Protection Act complaint. In early November 2017, the plaintiff voluntarily dismissed the case.

104. Throughout this time period, consumers repeatedly made complaints about Point Break, both to the FTC and on public internet forums. Point Break's own Google business listing, for example, was littered with reviews from angry consumers.

105. In October 2017, a reporter from Boston's local Fox affiliate showed up unannounced at Point Break's call center to confront Ramsey. Ramsey declared that he was "follow[ing] all the rules," but admitted that he was doing "Google listings" work. Shortly thereafter, the Fox affiliate aired, and posted to its website, a story highlighting Ramsey and Point Break's robocall operation.

106. At around the same time, on October 20, 2017, a representative from Bank of America Merchant Services contacted Ramsey to inform him that the bank had decided to close the account that Point Break used to process credit card transactions. The bank's internal notes blame the closure on "the merchant's predatory services, scare tactics and processing history with high chargeback ratios." In the first twenty days of the month, Point Break had processed over $125,000 in credit card charges.

107.    Ramsey attempted to export his Point Break customer list from Bank of America Merchant Services on or around October 23, 2017.  Ramsey also sought to transfer all of Point Break's recurring charges to another payment gateway.

108.    Having lost the ability to receive credit card payments and apparently in need of cash, Point Break simply started writing checks to itself out of consumers' bank accounts, taking over $25,000 in just three days.  Ramsey endorsed all of these checks.

109.    At around the same time, on October 21, 2017, Ramsey opened a new Point Break checking account, the company's first account at Wells Fargo Bank.  On October 25, 2017, Ramsey added Pillonato as a signatory to that account, identifying him as a "part owner" of Point Break.

110.    Defendants split their deposits of the unauthorized checks between their existing Bank of America and new Wells Fargo checking accounts between October 24, 2017 and October 26, 2017.

111.    Once it had reestablished itself at Wells Fargo, Point Break continued operations, but told consumers that they could only pay by providing bank account information rather than by credit card.

112.    By early December 2017, Point Break had stopped making new sales.  In January 2018, it withdrew its authorization to conduct business in Florida.  Since January 2018, Point Break has continued to answer calls from consumers who previously had signed up for its services.

### DCP Marketing, LLC

113.    Pillonato formed DCP Marketing, LLC in Florida in March 2016.

114.    Pillonato is the registered agent and sole manager for DCP Marketing.

115.     Pillonato is the sole signatory on at least two of DCP Marketing's checking accounts.

116.     In late August and early September 2017, as pressure mounted on Point Break, DCP Marketing received over $61,000 from Point Break and funneled the money through Defendant Modern Internet Marketing and Defendant Molina to Defendant Modern Spotlight.

117.     Specifically, between August 25 and August 31, 2017, Point Break wired over $71,000 to DCP Marketing. Between August 25 and September 15, DCP Marketing then transferred over $61,000 of that $71,000 to Modern Internet Marketing. Modern Internet Marketing, in turn, transferred the money received from DCP Marketing to Modern Spotlight, either directly or through Molina.

118.     These transactions occurred at around the same time that Pocker and Molina formed and began operating Modern Spotlight Group.

119.     Additionally, on November 13, 2017, just weeks after Point Break lost the ability to charge consumers' credit cards, DCP Marketing established a merchant account, doing business as "Point Break."

120.     DCP Marketing used this account to continue Point Break's recurring charges—of either $169.99 or $99.99 per month—of consumers who had enrolled in the Citation Program.

121.     At around the same time, DCP Marketing started to deposit into its own account remotely created checks written to Point Break Media. Ramsey endorsed these checks.

122.     In November 2017, DCP Marketing also paid the monthly rent at the Defendants' 951 Broken Sound Parkway, Suite 188 address, despite the lease remaining in the name of Defendant Diaz's ConsultMe, LLC.

123.    Additionally, in early December 2017, when Point Break stopped paying employees, DCP Marketing started paying some of those employees. Modern Spotlight Group began paying others on November 22, 2017.

124.    DCP Marketing sent or received money, either directly or indirectly, to and from Defendants Pillonato, Molina, Point Break, Modern Spotlight, Modern Spotlight Group, Modern Internet Marketing, and Modern Source Media.

### Modern Spotlight LLC and Modern Spotlight Group LLC

125.    Defendant Pocker and non-party Paul DeCamara formed Defendant Modern Spotlight LLC in Florida on March 6, 2017.

126.    Pocker is a manager of Modern Spotlight and its registered agent.

127.    Pocker is a signatory on at least two Modern Spotlight checking accounts.

128.    Between March and June 2017, Modern Spotlight sold Google "claiming and verification" services to consumers.

129.    On March 14, 2017, Pocker, on behalf of Modern Spotlight, signed a lease to rent 550 Fairway Drive, Suite 104, Deerfield Beach, FL 33441. Both Modern Spotlight and Modern Spotlight Group have made rent payments pursuant to this lease agreement.

130.    As described in paragraphs 116-117 above, beginning in late August, Modern Spotlight received over $61,000 from Point Break, via Defendants DCP Marketing, Molina, and Modern Internet Marketing.

131.    On August 30, 2017, Pocker and Molina formed Modern Spotlight Group LLC in Florida. Pocker and Molina opened two Modern Spotlight Group checking accounts on September 13, 2017.

132.    Pocker is Modern Spotlight Group's registered agent, and Pocker and Molina are Modern Spotlight Group's sole managers.

133.    Modern Spotlight Group has at least two checking accounts, for which Pocker and Molina are also the sole signatories.

134.    Modern Spotlight Group incorporated at 550 Fairway Drive, Suite 104, Deerfield Beach, FL 33441 and lists this address on its website.

135.    Modern Spotlight Group also has or had a call center at 951 Broken Sound Parkway, Suite 188, Boca Raton, FL 33487.  Point Break and DCP Marketing have paid rent at this address.

136.    Modern Spotlight Group has participated in the deceptive acts and practices described above by using claims of affiliation with Google, threats of removal from Google, and promises of unique keywords to sell Google "claiming and verification" services to small business owners, as described in paragraphs 28-74.

137.    In late September 2017, Modern Spotlight Group started to pay most of the employees whom, until the week prior, had been paid by Modern Spotlight.

138.    In mid-November 2017, Modern Spotlight Group also started to pay most of the employees whom, until the week prior, had been paid by Point Break.

139.    Consumers who purchased Google listing services from Modern Spotlight Group or Point Break received virtually identical welcome emails.

140.    Modern Spotlight Group uses or used a "Google Business Listing Agreement" that is substantially similar to the "Google listing Agreement" that Point Break used.

141.    On one call with an undercover FTC investigator, a Modern Spotlight Group sales agent confirmed the connection between Point Break and Modern Spotlight Group.  When asked

whether Point Break and Modern Spotlight Group were the same, the agent stated, "So our company, we're—we're a new—we merged companies. So that company was not the greatest. So my company bought out—the company that I work for now bought the other company out."

142.    Modern Spotlight and Modern Spotlight Group have sent or received money, either directly or indirectly, to and from each other and Defendants Pocker, Molina, Point Break, DCP Marketing, Modern Internet Marketing, and Modern Source Media.

143.    Modern Spotlight Group and Modern Spotlight LLC each voluntarily dissolved on February 7, 2018.

144.    At around the same time that Modern Spotlight Group and Modern Spotlight voluntarily dissolved, Modern Spotlight Group representatives emailed the company's existing customers to introduce themselves as "the representative assigned to your google listing."

145.    On February 23, 2018, an FTC undercover investigator called the phone number provided in Modern Spotlight Group's email. The representative who had sent the email told the investigator that Modern Spotlight Group had "relocated offices three weeks ago." When the investigator asked for Modern Spotlight Group's new address, the representative answered that it was 4730 NW 2nd Avenue, Suite 200, Boca Raton, Florida. Perfect Image Online also uses this office space.

146.    When the investigator asked if "everything else was still the same," the representative stated, "Everything else is still the same. We just relocated offices."

### Modern Source Media, LLC

147.    Pillonato formed Defendant Modern Source in Florida on November 13, 2017.

148.    Pillonato is the registered agent and sole manager of Modern Source.

149.  Pillonato is a signatory on at least one Modern Source checking account. DCP Marketing made the initial deposit into this account.

150.  Modern Source incorporated at 550 Fairway Drive, Suite 104, Deerfield Beach, FL 33441 and lists this address on its website.

151.  Pillonato also opened a merchant account on behalf of Modern Source, through which it has charged consumers' credit cards. That merchant account also uses the 550 Fairway Drive address.

152.  Since November 2017, Modern Source has engaged in the acts and practices described in paragraphs 75-84 above. Specifically, Modern Source has built on Modern Spotlight Group's deceptive acts and practices by deceptively upselling Modern Spotlight Group's victims on the Citation Program.

153.  After telling an FTC undercover investigator that his company "just recently went to [sic] a change," a Modern Source sales agent informed the investigator that Modern Source and Modern Spotlight were "sister compan[ies]."

154.  That same sales agent also said that he had "been with these guys for almost two years now," despite the fact that Modern Source had formed less than two months prior to the conversation. The agent later added that "the old name, it was Pointbreak is what they were going by" and then confirmed that "it went from Pointbreak to Modern Spotlight."

155.  Over two weeks prior to Modern Source's formation, Point Break obtained a toll-free number that Modern Source now lists on its website.

156.  For consumers who agree to the upsell, Modern Source uses virtually the same Citation Services and Reporting Agreement as Point Break.

157.    Modern Source has sent or received money, either directly or indirectly, to and from Defendants Pillonato, DCP Marketing, and Modern Spotlight Group.

### Perfect Image Online LLC

158.    Defendant Molina formed Perfect Image Online LLC in Florida on December 29, 2017.

159.    Molina is the registered agent and sole manager of Perfect Image Online.

160.    Molina is the sole signatory on at least one Perfect Image Online checking account.

161.    Perfect Image Online shares with Modern Spotlight Group the office space at 4730 NW 2nd Avenue, Suite 200, Boca Raton, FL 33431.

162.    Since February 2018, Perfect Image Online has participated in the deceptive acts and practices described in paragraphs 28-74 above, by using claims of affiliation with Google, threats of removal from Google, and promises of unique keywords to sell Google "claiming and verification" services to small business owners.

### Modern Internet Marketing LLC

163.    Non-party Sean Pocker, the brother of Defendant Michael Pocker, formed Defendant Modern Internet Marketing in Florida in July 2017.

164.    Modern Internet Marketing is located at 550 Fairway Drive, Suite 104, Deerfield Beach, FL 33441.

165.    As described in paragraphs 116-117 above, beginning in late August, Modern Internet Marketing facilitated the transfer of over $61,000 from Defendant Point Break to Defendant Modern Spotlight.

166. Modern Internet Marketing also has transferred almost all of the other money it has received directly to Modern Spotlight.

167. Modern Internet Marketing has sent or received money, either directly or indirectly, to and from Defendants Molina, Point Break, DCP Marketing, and Modern Spotlight.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

168. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

169. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

170. Acts or practices are unfair under Section 5 of the FTC Act if they cause, or are likely to cause, substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### COUNT I – Deceptive Representations

171. In numerous instances, in the course of marketing, offering for sale, and selling Google listing or search engine optimization services, Defendants represent or have represented, expressly or by implication, that:

    A.     Defendants are authorized by, or affiliated with, Google.

    B.     Consumers' businesses are in imminent danger of being marked permanently closed by Google or removed from Google's search results because consumers have not "claimed and verified" those businesses with Google.

    C.    Defendants, as part of claiming and verifying the consumers' businesses, can assign certain keywords to those businesses that will result in the prominent display of the businesses' websites or listings.

    D.    Defendants can guarantee prominent, first-page, or first-place placement in Google search results to consumers who pay for the Defendants' Citation Program.

172.    In truth and in fact:

    A.    Defendants are not authorized by, or affiliated with, Google.

    B.    Consumers' businesses are not in imminent danger of being marked permanently closed by Google or removed from Google's search results.

    C.    Defendants cannot, as part of claiming and verifying consumers' businesses, assign to those businesses certain keywords that will result in the prominent display of the businesses' websites or listings.

    D.    Defendants cannot guarantee prominent, first-page, or first-place placement in Google search results to consumers pay for the Defendants' Citation Program.

173.    Therefore, Defendants' representations as set forth in Paragraph 171 are false, misleading, or were not substantiated at the time they were made, and thus, they constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT II – Unfair Billing Practices

174.    As described in Paragraphs 85-87, in numerous instances, Defendants have obtained consumers' bank account information and caused billing information to be submitted for payment on those accounts without consumers' authorization.

175.    Defendants' actions caused substantial injury to consumers that consumers could not reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition.

176.    Therefore, Defendants' practices described in Paragraph 174 of this Complaint constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## CONSUMER INJURY

177.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

178.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to

preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions, and an order providing for immediate access, the turnover of business records, an asset freeze, the appointment of a receiver, and the disruption of domain and telephone services;

      B.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

      C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

      D.      Award Plaintiff FTC the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
Acting General Counsel

Dated: May 7, 2018

_____
Evan M. Mendelson, Special Bar No. A5502430
Christopher J. Erickson, Special Bar No. A5502434
Brian M. Welke, Special Bar No. A5502432
Federal Trade Commission
600 Pennsylvania Ave. NW
Mailstop CC-9528
Washington, DC 20580
(202) 326-3320; emendelson@ftc.gov
(202) 326-3671; cerickson@ftc.gov
(202) 326-2897; bwelke@ftc.gov
Fax: (202) 326-3197
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

JS 44 (Rev. 06/17) FLSD Revised 06/01/2017

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS** Federal Trade Commission

**DEFENDANTS** Pointbreak Media, LLC, et al.

**(b)** County of Residence of First Listed Plaintiff

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Broward

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Evan Mendelson, Christopher Erickson, & Brian Welke, FTC, 600 Pennsylvania Ave NW, Washington, DC 20580, (202) 326-3320

Attorneys *(If Known)*

MAY 07 2018

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☒ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed (See VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district *(specify)*   ☐ 6 Multidistrict Litigation Transfer   ☐ 7 Appeal to District Judge from Magistrate Judgment   ☐ 8 Multidistrict Litigation – Direct File   ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

*(See instructions):* a) Re-filed Case ☐ YES ☒ NO    b) Related Cases ☐ YES ☒ NO

JUDGE:     DOCKET NUMBER:

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 45(a), 53(b); Deceptive sale of Google listing and search engine optimization services

LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☒ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE 5/7/2018    SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    IFP    JUDGE    MAG JUDGE



## GENOVESE
## JOBLOVE&
## BATTISTA
— P.A. —
ATTORNEYS AT LAW

Colleen M. Hopkins, ACP, FRP
Phone:  954.453.8016
Email:  chopkins@gjb-law.com

September 4, 2018

3;18-MC-519

**_Sent Via Federal Express_**

United States District Court
Middle District of Pennsylvania
235 North Washington Avenue
Scranton, PA 18503
Phone:  (570) 207-5600

     RE:  Miscellaneous Matter

To Whom it May Concern:

     Pursuant to the District Court, Southern District of Florida's, _Stipulated Preliminary Injunction_ [DE #170] and pursuant to 28 U.S.C. §754 (Property of the Receiver), please find the enclosed pleadings with the Miscellaneous filing fee check in the amount of $47.00 to be filed in the Middle District of Pennsylvania.

     Please contact me with any questions or concerns.

          Sincerely,

          Colleen M. Hopkins

Enclosure(s)

[10675-007/2917815/1]

200 East Broward Boulevard, Suite 1110 • Fort Lauderdale, Florida 33301 • Telephone: 954.453.8000 • Facsimile 954.453.8010



For FedEx Express® Shipments Only

Align bottom of Peel and Stick Airbill or Pouch here.

ORIGIN ID:HWOA    (954) 453-8000
COLLEEN HOPKINS
GENOVESE JOBLOVE BATTISTA
200 EAST BROWARD BLVD.
STE. 1110
FORT LAUDERDALE, FL 33301
UNITED STATES US

SHIP DATE: 05SEP18
ACTWGT: 5.00 LB
CAD: 9911459/INET4040

BILL SENDER

TO  U.S DISTRICT COURT MIDDLE DISTRICT
OF PENNSYLVANIA
WILLIAM J. NEALON FEDERAL BLDG.
235 NORTH WASHINGTON AVENUE
SCRANTON PA 18503
(507) 207-5600        REF: 10675-007
INV:
PO:                   DEPT:

FedEx
Express

E

THU - 06 SEP 10:30A
PRIORITY OVERNIGHT

TRK#
0201   7731 4160 0850

XH AVPA                    18503
                PA-US      ABE